IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 20–156–M–DLC |
| Plaintiff, | (Consolidated with Case No. CV–20–157–DLC) |
| vs. | |
| LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE, | ORDER |
| Defendants. | |

Before the Court is United States Magistrate Judge Kathleen L. Desoto's Findings and Recommendation.  (Doc. 39.)  The parties have filed cross motions for summary judgment.  (Docs. 17; 22.)  Judge DeSoto recommends that these motions be granted in part and denied in part, that the challenged project be enjoined, and that the matter be remanded to remedy legal defects.  (Doc. 39.)  For the reasons stated herein, the Court will adopt Judge DeSoto's findings and recommendation in full.

**BACKGROUND**

The Lolo National Forest was established in 1906 and sprawls across northwestern Montana.  (*See* Doc. 30 at 2.)  Management of the Lolo National

1

Forest is governed by a forest plan adopted in 1986 ("Forest Plan"). (Doc 27 at 5.) The Forest Plan "guides all natural resource management activities and establishes management standards for the Lolo National Forest. It describes resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." (Doc. 30 at 2; *see also* Doc. 27 at 5.)

At issue in this action is the Soldier-Butler Project ("the Project"), which encompasses a portion of the Ninemile Ranger District within the Lolo National Forest. (*See* Doc. 27 at 4–5.) Plaintiff Alliance for the Wild Rockies ("Plaintiff") claims the Project's implementation violates the National Forest Management Act ("NFMA") and the Endangered Species Act ("ESA"). (*See generally* Doc. 10.)[1] AWR seeks to enjoin implementation of the Project and remand to the appropriate agencies to ensure compliance with the law. (*Id.* at 54.) As noted above, both parties have moved for summary judgment and Judge DeSoto recommends such motions be granted in part and denied in part. (Doc. 39 at 53–54.)

## ANALYSIS

In the absence of an objection, this Court reviews findings for clear error. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003); *Thomas v. Arn*,

---

[1] AWR's complaint also advances claims under the National Environmental Policy Act ("NEPA") (Doc. 10 at 43-47), but AWR does not contest Judge DeSoto's conclusion that these claims are waived. (Doc. 40 at 2.) Consequently, the Court does not address them.

474 U.S. 140, 149 (1985).  Clear error review is "significantly deferential" and

exists when the Court is left with a "definite and firm conviction that a mistake has

been committed."  *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000)

(citations omitted).  This Court reviews de novo any findings to which a party

specifically objects.  28 U.S.C. § 636(b)(1)(C).

Judge DeSoto's findings and recommendations concluded that:

(1)     the record lacked sufficient evidence to support the conclusion that the
Project complies with the Forest Plan's 50:50 coverage to forage ratio
standard;

(2)     the Project complies with the Forest Plan's standards regarding
logging and road building activities;

(3)     the record lacked sufficient evidence to support the conclusion that the
Project complies with the Forest Plan's standards regarding snags;

(4)     the Project complies with the Forest Plan's standards regarding water
quality sedimentation;

(5)     reconsultation is necessary to assess the impact of new information
(137 roads of undetermined roads) on grizzly bears and the 2012
Incidental Take Statement;

(6)     reconsultation is necessary to assess the impact on grizzly bears from
the Project's partial reversal of the Frenchtown Face Project's road
decommission decision; and

(7)     the Project complies with the 2017 NCDE Incidental Take
Statement's reasonable and prudent measures.

(Doc. 39.)  As noted above, Judge DeSoto also recommends that the Project be

enjoined, and that the "matter be remanded to the agencies to remedy its NFMA

3

and ESA violations, including reinitiating" the appropriate consultations.  (Doc. 39 at 53–54.)

Defendants have timely submitted 7 objections, which are targeted at Judge DeSoto's first, third, fifth, and sixth conclusions, enumerated above.  (Doc. 40.) AWR has not submitted any objections but has provided responses to Defendants' objections.  (Doc. 41.)  The Court finds no clear error in the unobjected to portions of Judge DeSoto's findings and recommendation and will adopt them in full. These conclusions are well reasoned and thorough, and the Court has neither a definite nor firm conviction that a mistake has been committed.  As such, the Court will address each objection in turn and review de novo the issues presented.

## I.    NFMA Violations.

NFMA requires every national forest to be managed in accordance with a governing forest plan.  16 U.S.C. § 1604(a); *see also Friends of the Bitterroot v. Marten*, 2020 WL 5804251, *2 (D. Mont. 2020).  These plans "guide all natural resource management activities" within the national forest "including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728–29 (1998).  Any project within a national forest must be consistent with the governing forest plan, but the Forest Service is afforded "substantial deference" in determining whether an action meets this consistency standard.  *Great Old Broads*

4

*for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013).  Nonetheless, it "is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA."  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

To comply with NFMA, the Forest Service must analyze proposed projects "and the analysis must show that each project is consistent with the" governing forest plan.  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1061–62 (9th Cir. 2002).  As such, the question in any NFMA challenge is whether the Court "can reasonably discern from the record that the Forest Service complied with" the Forest Plan's standards, "and thereby complied with NFMA."  *Native Ecosystems Council*, 418 F.3d at 961.  The Court will address each challenged NFMA violation in turn.

### 1.   Objection 1—Project Compliance with Forest Plan's 50:50 Coverage to Forage Ratio Standard.

Judge DeSoto concluded that Defendants violated NFMA "by not complying with [the Forest Plan's] Standard 7 for MA 18 and Standard 6 for MA 23."  (Doc. 39 at 17.)  These standards both provide, "Retain as a minimum a 50:50 coverage:forage ratio.  The majority of cover should be thermal cover, that is, trees greater than or equal to 40 feet tall with a crown density greater than or equal to 50 percent."  (L-3:001936, 011965.)  Judge DeSoto's conclusion as to this issue was multi-faceted.  (Doc. 39 at 10–18.)

First, Judge DeSoto noted that documents associated with the Project specifically concluded that the Forest Plan's coverage forage ratio standards would not be met, absent changes or a site-specific Forest Plan amendment.  (*Id.* at 11.) Second, Judge DeSoto concluded that although Defendants had identified certain measures that may ensure the Project adheres to the Forest Plan's coverage forage ratio standards, they had failed to develop a record from which the Court could reasonably discern whether that would actually be the case.  (*Id.* at 15.)  Finally, Judge DeSoto rejected Defendants' contention that strict compliance with the Forest Plan's coverage forage ratio standards was unnecessary.  (*Id.* at 17.)  As such, Judge DeSoto concluded NFMA had been violated.

Defendants object to this conclusion.  In essence, Defendants argue that: (1) the Forest Plan's coverage forage ratio standards are not "rigid requirements," but instead are simply some of several Forest Plan goals related to elk winter range; and (2) Judge DeSoto failed to demonstrate how Defendants' conclusion that the other measures they identify satisfy the Forest Plan's coverage forage ratio standards was arbitrary and capricious.  (Doc. 41 at 8–17.)  Plaintiffs have responded to these objections arguing that the Forest Plan's coverage forage ratio standards must be adhered to and that Judge DeSoto was correct in concluding "[t]here is no basis in the record that the Forest Service" complies with such standards.  (Doc. 41 at 2–6.)  Upon de novo review, the Court finds Judge

DeSoto's conclusions are correct.

At the outset, the Court must address the issue of whether the Forest Plan provisions at issue are requirements that must be adhered to or rather goals that can yield to the Forest Plan's competing objectives.  To be sure, any forest plan must balance competing "environmental and economic concerns," *Kimbell*, 709 F.3d at 850, and may contain both goals and explicit standards. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 793 (9th Cir. 2018).  But a forest plan's goals are not "merely aspirational . . . purely optional," or "just a wish list that impose[] no obligations." *Id*.  Instead, the Forest Service's failure to comply with a forest plan's goal may very well constitute a NFMA violation.  *Id*.  Accordingly, even if the Forest Plan's coverage forage ratio provisions are properly classified as "goals" instead of standards, it does not automatically follow that Judge DeSoto's conclusions were incorrect.

The Court finds the Forest Plan's coverage forage ratio standards enumerate both a standard and goal.  As noted above, the relevant provisions state "Retain as a minimum a 50:50 coverage:forage ratio.  The majority of cover should be thermal cover, that is, trees greater than or equal to 40 feet tall with a crown density greater than or equal to 50 percent."  (L-3:001936, 011965.)  The Court agrees with Judge DeSoto that the Forest Plan's directive that a minimum 50:50 coverage:foreage ratio be retained is about as close to a standard as it gets.  (Doc.

7

39 at 17.)  This language is not ambiguous and Defendants' proposed interpretation, which would construe the 50:50 standard as optional, is not entitled to the slightest deference.  *Lands Council v. Powell*, 395 F.3d 1019, 1034 (9th Cir. 2005).

Defendants' argument regarding thermal cover fairs a bit better.  The Forest Plan's adoption of the qualifier "*should*" indicates the thermal cover directive is more akin to a goal than a standard.  The Court is prepared to defer to Defendants' interpretation of the thermal cover provision as a goal instead of a standard.  But, as noted above, it does not automatically follow that this goal can always be disregarded in favor of competing considerations.  *Marten*, 883 F.3d at 793.  In the end, the Court agrees with Judge DeSoto that the record is not sufficiently developed to permit this Court to make the call one way or another.  Accordingly, the Project violates NFMA.

As planning for the Project proceeded, the Forest Service itself acknowledged that certain actions taken to facilitate the Project may run afoul of the Forest Plan's coverage forage ratio standard.  (*See, e.g.,* A-3:000329.)  In fact, the Project's Environmental Assessment even concluded a project-specific Forest Plan amendment would be necessary to avoid contravening the coverage forage ratio standard.  (A-3:000430–431.)  The Project's Final Decision Notice noted that some of the activities included in the Environmental Assessment would not be

8

implemented, thus obviating the need for a Forest Plan amendment related to cover forage ratios.  (A-4:000513.)

Defendants' substantive objections to Judge DeSoto's conclusions do little more than reiterate alternative measures that apparently ensure the coverage forage ratio is met.  (Doc. 40 at 15.)  But this argument misses the point of the problem Judge DeSoto recognized in her findings and recommendation.  Namely, that the record simply did not reveal how these alternative measures would ensure the Project complied with the Forest Plan's 50:50 coverage forage ratio standard.  In other words, Defendants need to show their work.

In their objections, Defendants construe Judge DeSoto's conclusions as holding that "the Forest Service must provide a precise calculation of the amount of cover to demonstrate compliance with the Forest Plan."  (Doc. 40 at 14.)  But this is not an accurate depiction.  Instead, Judge DeSoto simply remained faithful to the precepts of *Native Ecosystems Council*, which firmly establishes that while "Forest Service calculations need not be perfect," there must be at least *some* calculation by which a Court can reasonably ascertain whether the standard has been complied with.  418 F.3d at 963.  As Judge DeSoto concluded, the issue in this case is that Defendants have not provided any updated calculation at all.  The

Court cannot simply take Defendants' word.[2]

Put another way, the alternative measures identified by Defendants may very well ensure that the Forest Plan's 50:50 coverage forage ratio standard is satisfied. But NFMA requires the Defendants to develop an administrative record that permits this Court to exercise meaningful judicial review.  At this juncture, Defendants have not done so and this failure amounts to a NFMA violation. After reviewing the matter de novo, the Court will adopt Judge DeSoto's recommendation on this issue in full.

### 2.    Objection 2—Project Compliance with Forest Plan's Snag Standard.

The standard at issue ("Standard 4") provides that, within Management Area 21, "Provide stands at least 30 to 40 acres in size that are decadent, multi-storied, fully stocked, contain snags with dead and down material greater than 15 tons per acre, and contain 15 trees per acre greater than 20 inches d.b.h.  These stands should be well distributed over the Forest." (L-3:011957.)  As with the coverage forage ratio discussed above, Judge DeSoto concluded that it could not be determined from the record whether the Project complied with this standard.

---

[2] Indeed, the Court notes that even if it could merely take Defendants at their word, doing so would be difficult in this case.  Defendants have repeatedly argued to this Court that they need not comply with the Forest Plan's 50:50 coverage forage ratio standard *at all* because it is simply one of several competing goals contained within the plan.  Because Defendants have devoted so much argument to this point, the Court struggles to accept their self-serving statements that even if it were binding (which it is), steps have been taken to ensure it is met.

Defendants object to this conclusion, arguing that Judge DeSoto erroneously applied: (1) "a standard for *existing* old growth habitat to a Project that does not rate any stands that satisfy old-growth criteria"; and (2) "a quantifiable requirement for snags when there is none in Standard 4 itself." (Doc. 40 at 20.) Plaintiff responds that, as Judge DeSoto concluded, the administrative record contains nothing from which it can be determined whether the standard at issue is met. (Doc. 41 at 7–8.)

Defendants first argument is difficult to track. Defendants appear to argue that Standard 4 does not apply to the Project because that standard only applies to habitats that, unlike the Project area, already "satisfy old-growth criteria." (Doc. 40 at 19.) Defendants raised this argument in a few sentences in a summary judgment brief submitted to Judge DeSoto. (Doc. 23 at 26.) The Court ultimately finds it unavailing.

The Forest Plan describes Management Area 21 as "a variety of forested lands . . . located throughout the Forest in such a way as to evenly distribute old age stands of timber for wildfire species dependent on old growth for habitat." (L-3:011956.) An enumerated goal of Management Area 21 is to provide "for old-growth succession in timber stands with an optimum arrangement of habitat components to maintain viable populations of old-growth dependent wildlife species." (*Id.*) Critically, the Forest Plan establishes various standards for

11

Management Area 1, including Standard 4 which mandates "stands at least 30 to 40 acres in size that are decadent, multi-storied, fully stocked, contain snags with dead and down material greater than 15 tons per acre, and contain 15 trees per acre greater than 20 inches d.b.h."  (*Id.* at 011957.)

Besides conclusorily asserting it to be so, Defendants have not explained why Standard 4 is only applicable to stands falling within pre-existing old growth areas.  This interpretation conflicts with Standard 4's text, which directs the Forest Service to provide a very specific combination of stands and snags within the Forest.  Standard 4 contains no language limiting itself only to existing old growth areas.  This interpretation of the Forest Plan is inconsistent with its plain language and therefore cannot prevail.  *Powell*, 395 F.3d at 1034.

As to the second argument, while the Court agrees that Standard 4 does not contain an explicit quantifiable requirement for snags, this misses the point of Judge DeSoto's ruling.  Judge DeSoto correctly interpreted Standard 4 to require the Forest Service to preserve and foster stands and snags meeting certain criteria within Management Area 21.  (Doc. 39 at 26.)  Judge DeSoto also correctly noted that the Project intends to undertake certain logging activities within Management Area 21, which may result in the destruction of the sort of stands and snags protected by Standard 4.  (*Id.* at 25–26.)

At bottom, the problem is not the Project's proposed activities, but rather

that Defendants have failed to develop an administrative record that permits this Court to discern whether the Project will contravene the Forest Plan's fourth standard for Management Area 21.  Without more, the Court has no choice but to conclude NMFA has been violated.  *Native Ecosystems Council*, 418 F.3d at 961. Remand is necessary to ensure the administrative record reasonably establishes the Project is consistent with Standard 4.

## II.   Reinitiation of Consultation Under the ESA.

Section 7 of the ESA requires agencies to consult with the appropriate entities to ensure proposed actions do not adversely impact an endangered or threatened species.  16 U.S.C. § 1536(a)(2).  If the consultation process reveals that an incidental taking of an endangered or threatened species may occur, then an incidental take statement must be prepared.  *Id.* § 1536(b)(4).  This statement outlines the impact of the taking, reasonable and prudent measures necessary to minimize the impact, and the terms and conditions of the taking.  *Id.*  Consultation must be reinitiated if "the amount or extent of taking specified in the incidental take statement is exceeded" or "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(a).

Judge DeSoto found that reinitiation of § 7 consultation was necessary for a variety of reasons.  First, Judge DeSoto concluded that consultation was required

so that the impact of new information (137 miles of undetermined roads within the Project area) on grizzly bears could be assessed.  (Doc. 39 at 37–44.)  Second, Judge DeSoto concluded that consultation was required because the Project possibly exceeds the parameters established by a 2012 Amended Incidental Take Statement.  (*Id.* at 44–47.)  Finally, Judge DeSoto concluded that consultation had not sufficiently addressed the Project's reversal of the Frenchtown Face Project's planned decommissioning of 37 miles of roads within the Project area.  (*Id.* at 48–52.)  The Court will address the objections leveled at these conclusions in turn.

### 1.  Objections 3—Compliance with Forest Plan's Incidental Take Statement and the Northern Continental Divide Ecosystem Amendments.

Defendants object to Judge DeSoto's conclusion that the Project "is not compliant with the 2012 Amended Incidental Take Statement and Northern Continental Divide Ecosystem Amendments."  (Doc. 40 at 21.)  The crux of Defendants' argument is that the 2020 Biological Opinion prepared in furtherance of the Project already "provided site-specific analysis of the effect of the roads within the action area on the grizzly bear."  (*Id.* at 22.)  As such, in their view, no further consultation is necessary even if they may have contravened "larger scale and dated Forest Plan biological opinions."  (*Id.* at 23.)  Upon de novo review, the Court agrees with Judge DeSoto.

The problem with Defendants' objection is the same problem Judge DeSoto

14

identified multiple times in her Findings and Recommendation.  Namely, that

Defendants have not pointed to any authority supporting the notion that site-

specific analysis absolves them of their obligations to comply with the governing

forest plan.  (Doc. 39 at 39–40.)  If, as Defendants themselves state, the Forest Plan

remains bound by "dated" biological opinions, then that is all the more reason to

engage in the sort of consultation recommended by Judge DeSoto.  This objection

will be overruled and consultation will be ordered to assess the impact of 137 miles

of undetermined roads within the Project area on the Forest Plan's applicable

baselines.

### 2. Objection 4—The 137 Miles of Undetermined Roads in the Project Area Is Not New Information.

Defendants object to Judge DeSoto's ESA analysis, arguing that she

"incorrectly characterized the 137 miles of undetermined roads as 'new'

information that would render the baselines for the 2012 Amended Incidental Take

Statement and the Northern Continental Divide Ecosystem Amendments

inaccurate."  (Doc. 40 at 24.)  Defendants contend the "roads in question are not

new and have existed in the Lolo Forest for several years."  (*Id.*)  Plaintiffs respond

that Judge DeSoto was correct in classifying the roads at issue as new information

necessitating the reinitiation of § 7 consultation because the record does not reflect

they were considered or even existed at the time of the 2012 Amended Incidental

Take Statement and the Northern Continental Divide Ecosystem Amendments

were created.  (Doc. 41 at 11.)  The Court agrees.

To constitute "new information" within the meaning of 50 C.F.R. § 402.16(a), such information need not be novel in the ordinary sense, but instead must have not been previously considered in prior ESA analyses.  Here, the Court agrees with Judge DeSoto and Plaintiffs that the record is devoid of any evidence that the 137 miles of undetermined roads within the Project area were considered when the baseline was established by the 2012 Amended Incidental Take Statement and the Northern Continental Divide Ecosystem Amendments.  If Defendants are correct that the roads were known at the time those documents were generated, they need only establish that during the reconsultation process.  At this point, the record is not sufficiently developed to permit this Court to make the call.  The objection will be overruled.

### 3.     Objection 5—The 137 Miles of Undetermined Roads Has No Effect on the 2012 Amended Incidental Take Statement as Applied to the Project.

Defendants next objection contends that Judge DeSoto "erroneously concluded that the effect of the 137 miles of roads on the 2012 Amended Incidental Take Statement will render the baseline as applied to the" Project "inaccurate."  (Doc. 40 at 26.)  Defendants argue that the 7.14-mile threshold contained within the 2012 Amended Incidental Take Statement only applies to the construction of new permanent roads, and because the 137 miles of roads are not

newly constructed, the take statement will not be offended.  (*Id.* at 26–27.)  This argument appears to misconstrue DeSoto's ruling on this issue.

In her findings and recommendation, Judge DeSoto did not conclude that the 137 miles of undetermined roads would offend the 7.14-mile threshold.  Instead, Judge DeSoto concluded that because it cannot be determined whether the 137 miles of undetermined roads were considered in establishing the baseline from which the 7.14 miles threshold is assessed, it cannot be determined whether the Project will exceed the 7.14-mile cap on newly constructed roads because the operative baseline is possibly incorrect.  As such, the Court will overrule this objection.  As stated above, reconsultation is necessary to assess whether the 137 miles of undetermined roads within the Project area were incorporated into the Forest Plan's governing baselines.  Until that occurs, this Court cannot determine whether the Project runs afoul of the 7.14 mile newly constructed roads limitation.

### 4.    Objection 6—The 137 Miles of Undetermined Roads Will Not Affect the NCDE Amendments' Standard Relevant to the Project.

Defendants object to Judge DeSoto's conclusion regarding the Project's compliance with the NCDE baseline, because "the only relevant NCDE standard applies to public roads, and undetermined roads are not public roads."  (Doc. 40 at 28.)  As such, in Defendants' view, even if the 137 miles of undetermined roads were not previously considered in establishing the NCDE's baseline standards,

reconsultation would not change that because such roads are not "open to public motorized access and would not be included in a baseline for the standard." (*Id.* at 28.) Plaintiffs respond that Defendants' position is belied by the record, which demonstrates at least some of the undetermined roads are open to public motorized access or will be in the future. (Doc. 41 at 12.) The Court once again finds that the record supports Plaintiffs' position.

To be sure, as Defendants point out the Project's transportation planning report notes that any undetermined roads within the Project area are "legally closed yearlong to wheeled motorized vehicles." (K11-1:006572.) But, as Plaintiffs point out, the very same report goes on to state that these undetermined roads remain accessible to and are used by "adjacent private landowners" (*id.*) and a small portion of the undetermined roads will be open to the public (*id.* at 006580–82). Reconsultation should endeavor to clarify these disparate positions and generate a sufficient record from which this Court can confirm none of the 137 miles of undetermined roads should have been incorporated into the applicable NCDE baseline. This objection will be overruled.

### 5. Objection 7—The 2020 Biological Opinion Adequately Considers the Project's Reversal of the Frenchtown Face Road Decommissioning Project.

Defendants' object to Judge DeSoto's conclusion that reconsultation is necessary because the Project's 2020 Biological Opinion fails to address the

impacts on grizzly bears from the Project's reversal of the Frenchtown Face

Project's road decommissioning decision.   (Doc. 40 at 29.)   Specifically,

Defendants contend that Judge DeSoto misapplied certain regulations and

"confuse[d] the analysis by treating the Frenchtown Face Project's planned

decommissioning of roads in the overlap area as certain future events that must be

addressed in consultation."  (*Id.* at 30.)  The Court finds that Defendants'

objections should be overruled.

Defendants devote significant argument to the contention that Judge DeSoto

wrongly concluded they had failed to consider the "cumulative effects" of the

Frenchtown Face Project during § 7 consultation because "cumulative effects"

encompass only those activities in which the federal government is not involved.

(Doc. 40 at 29–30.)  Because the Frenchtown Face Project is a "federal agency"

activity, Defendants argue it need not be factored into any "cumulative effects"

analysis.  This objection fails to acknowledge that it is the Project's *action*, in

reversing the Frenchtown Face Project, that is at issue.

During § 7 consultation, Defendants must "[e]valuate the effects of the

action and cumulative effects on the listed species or critical habitat." 50 C.F.R. §

402.14(g).  The ESA defines "effects of the action" as "all consequences to listed

species or critical habitat that are caused by the proposed action, including the

consequences of other activities that are caused by the proposed action."  *Id.* §

402.2.  These actions must be "reasonably certain to occur."  *Id.*  As Defendants

point out, "cumulative effects" are "those effects of future State or private

activities, not involving Federal activities, that are reasonably certain to occur

within the action area of the Federal action subject to consultation."  *Id.* § 402.2

Defendants' argument fails because, while the Project's reversal of a portion

of the Frenchtown Face Project may not be a "cumulative effect," it is certainly a

direct effect of the Project itself.  Defendants do not dispute that the Project

reverses the Frenchtown Face Project's decommissioning of "about 37 miles" of

roads within the Project area.  (A-3:000316).  That is, the record is clear that the

action at issue it a direct result of the Project itself, not any ancillary state or

federal action.  This renders it an effect of the action, within the meaning of 50

C.F.R. § 402.2, that must be addressed by § 7 consultation.  This portion of

Defendants' objection will be overruled.

Defendants also argue that Judge DeSoto erroneously held reconsultation

into the Project's reversal of a portion of the Frenchtown Face Project was

necessary, because the decommissioning planned by the Frenchtown Face Project

is not reasonably certain to occur.  (Doc. 40 at 30–31.)  In other words, Defendants

appear to argue that they need not undertake consultation into reversal of some of

the Frenchtown Face Project's road decommissioning decisions, because it is not

clear the Forest Service would have actually decommissioned the roads at issue.

The Court agrees with Plaintiff that it should assume the Forest Service will abide by "legally-binding commitments . . . [made] in a record decision." (Doc. 41 at 14.)

The Project reversed the Frenchtown Face Project's decision to decommission 37 miles of roads in the Project area. (A-3:000316). The biological opinion prepared pursuant to the Project does not address this reversal or assess its impact on grizzly bears. The Court cannot ignore this shortcoming on the basis that the Frenchtown Face Project may not actually be seen to completion. Under these circumstances, the consultation process must be reinitiated. Based on the foregoing, the Court will overrule Defendants' ESA objections.

The Court notes that Defendants have advised that a draft biological assessment has been drafted and submitted. (Doc. 40 at 30.) Defendants argue this renders Plaintiff's "claim for reinitiating consultation on the Forest Plan moot." (*Id.* at 33.) This is incorrect. Plaintiff's claims *may* become moot if Defendants' updated biological assessment rectifies the defects found in the original. This is not a guarantee and is insufficient to support dismissal of Plaintiff's reconsultation claims on mootness grounds. *Alliance for the Wild Rockies v. Marten*, 200 F. Supp. 3d 1129, 1130–31 (D. Mont. 2016).

## ORDER

Accordingly, IT IS ORDERED that Defendants objections to Judge

21

DeSoto's findings and recommendation (Doc. 39) are OVERRULED.

IT IS FURTHER ORDERED that Judge DeSoto's findings and recommendation (Doc. 39) is ADOPTED in full.

IT IS FURTHER ORDERED that the parties' motions for summary judgment (Docs. 17; 22) are GRANTED in part and DENIED in part, as outlined in Judge DeSoto's findings and recommendation (Doc. 39).

IT IS FURTHER ORDERED that implementation of the Project is ENJOINED and this matter is REMANDED for the purpose of remedying the identified NFMA and ESA violations and reinitiating consultation for both the Forest Plan and Project.

DATED this 5th day of October, 2021.

Dana L. Christensen, District Judge
United States District Court